IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| GILL CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 05-0608-CV-W-SOW |
| | ) | |
| 18TH & VINE AUTHORITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court are defendant The 18th & Vine Authority's Motion for Summary Judgment (Doc. #86), defendant The 18th & Vine Authority's Suggestions in Support, plaintiff Gill Construction, Inc.'s Suggestions in Opposition, and defendant The 18th & Vine Authority's Reply. For the reasons stated below, defendant The 18th & Vine Authority's motion is denied.

### I. Background

Defendant The 18th & Vine Authority ("the Authority") moves for summary judgment on plaintiff Gill Construction, Inc.'s ("Gill") claim that the Authority violated the Missouri Uniform Fraudulent Transfer Act, §§ 428.005 to 428.059, Mo. Rev. Stat. The material facts relevant to the pending motion for summary judgment are as follows:

The Authority is a Missouri not-for-profit corporation that was formed on February 22, 1994. The Authority was set up as an instrumentality of the City of Kansas City, Missouri ("the City"). Congressman Emanuel Cleaver, II was mayor of Kansas City from April 10, 1991 until April 10, 1999. Cleaver was an original incorporator of the Authority and appointed the Board of Directors. Cleaver served as the Chairman of the Authority Board of Directors from its inception until the summer of 2002.

The Authority relies on the testimony of attorney Heather Brown to assert that the Authority was considered a component unit of the City until its Management Agreement was terminated. Plaintiff Gill responds that this assertion is not controverted; however, the Authority's articles of incorporation do not describe it as such. In addition, the Authority maintained separate financial accounting records as a separate and distinct legal entity recognized under the laws of the State of Missouri, was audited as a separate and distinct entity, maintained its own assets, and was free to have activities outside of its relationship with the City.

It is undisputed that the Authority was formed for the purpose of providing construction oversight and operations management over a City project that included a jazz museum, a performing arts theater, and a visitors' center in the vicinity of 18th Street & Vine Street. On or about May 1, 1994, the City entered into a five year Management Agreement with the Authority. Pursuant to the Management Agreement, the City appointed the Authority as its agent to carry out the redevelopment of the area around 18th Street & Vine Street.

The Management Agreement stated that the Authority had the obligation to oversee construction, but that all construction costs would then be paid by the City. It is undisputed that the City was ultimately responsible for paying for the construction of facilities in the 18th & Vine area. The prescribed mechanism was for the Authority to enter into contracts for construction as the agent for the City and as a separate legal entity.

Management Agreements between the City and the Authority were renewed periodically over the years. The last Management Agreement was entered into on May 1, 2002 for a one-year term ending on April 30, 2003. Pursuant to this 2002 Management Agreement, the City had the right to terminate the Management Agreement when it was in the City's best interests to do so;

however, the City was "liable under the payment provisions of this Agreement . . . for payment of services rendered before the effective date of termination." Plaintiff Gill clarifies that the City could exercise its right to terminate for convenience only if it first paid any liabilities arising out of services rendered to the Authority during the term of that Management Agreement or any preceding Management Agreement between the City and the Authority.

It is undisputed that between May 8, 1996 and March of 1997, plaintiff Gill entered into a series of construction contracts with the Authority. Subsequent to the completion of the construction contracts, Gill made a claim that his construction company was owed additional monies. This claim was denied by Claude F. Page, a Development Specialist employed by the Planning and Development Department of the City. Page had begun to act as the City's representative for managing the 18th & Vine construction in 1995.

Following Page's denial of its claim, plaintiff Gill filed suit against the Authority and the City on or about April 24, 2000. On or about June 14, 2002, a verdict was entered in favor of plaintiff Gill and against the Authority in the amount of $1,874,000.00. The City had been dismissed from the lawsuit prior to trial.

Following the June verdict in favor of plaintiff Gill, Heather Anne Brown drafted a confidential memorandum directed to the Board of Directors of the Authority. Defendant Authority claims that the board members have denied receiving such a memorandum. In her deposition, Ms. Brown testified that the Board of Directors "discussed the memo."

Heather Anne Brown is employed by the City of Kansas City, Missouri Legal Department. Her job is to represent various City departments. At all times relevant to the issues before this Court, Ms. Brown acted as the attorney for the Authority. In representing the

3

Authority, Ms. Brown provided legal advice as a member of the City's Legal Department. Ms. Brown was also responsible for providing legal advice to the American Jazz Museum.

The July 8, 2002 memorandum discusses "Options regarding the lawsuit" and "Business Options." It is undisputed that after the July 8, 2002 memo was written, members of the Board of Directors of the Authority discussed the various business options with the City. One of the "Business Options" in the memo was:

> **Formation of new corporation to manage museum**. A new nonprofit corporation could be formed to manage the museum. The City would terminate the agreement with the Authority and contract with the new entity.

Thereafter, the American Jazz Museum, Inc. was formed and the City terminated the Management Agreement with the Authority.[1] It is undisputed that Authority board members participated in meetings with the City about the formation of the American Jazz Museum, Inc. Ms. Brown consulted with Authority board members concerning when the new entity should be set up. Ms. Brown e-mailed Authority board member Mike White on July 10, 2002, encouraging him to "set up the corporation right now" so they could "use it in a hurry if necessary." Ms. Brown continued, "Besides the city contract (there is $587,000 left on the contract), we need to stop the revenue stream from admissions, etc from flowing into the Authority." Authority board members signed the articles of incorporation causing a new entity known as the American Jazz Museum, Inc. to be formed on or about July 17, 2002, seven days later.

---

[1] Defendant Authority claims that the Management Agreement between the Authority and the City was terminated in July of 2002. Plaintiff Gill states that the Management Agreement was not terminated until September of 2002. The Authority concedes that the Termination Agreement was executed on September 16, 2002.

4

Meanwhile, on or about July 11, 2002, the City passed Ordinance No. 020852 authorizing the Director of City Development to execute an agreement with American Jazz Museum for the remainder of the 2002-2003 fiscal year. The Ordinance transferred to the American Jazz Museum $586,603.72, the exact remaining balance in the City's account being held for the benefit of the Authority for the remainder of the 2002-2003 fiscal year. On or about July 17, 2002, American Jazz Museum, Inc. passed Resolution No. 02-007 authorizing the American Jazz Museum's Executive Director to enter into a Management Agreement with the City in the amount of $586,603.72 for the management and operation of and expenditures related to the 18th & Vine Project for fiscal year 2002-2003.

Heather Brown testified in her deposition that the purpose of this arrangement was to "protect the current revenues from the museum operations and the city subsidy from attachment by Gill Construction." Ms. Brown explained that the City did not want its funds to be attached by Gill or Gill's creditors either. Ms. Brown admitted that there was no other reason why the City would have terminated the Management Agreement with the Authority.

It is undisputed that Board members of the Authority were the incorporators of the American Jazz Museum, Inc. The executive director of the Authority became the executive director of the American Jazz Museum, Inc. Most of the Authority's employees became employees of American Jazz Museum, Inc. The American Jazz Museum had the exact same responsibilities and obligations as the Authority and the American Jazz Museum received all of the money that had previously been appropriated for the Authority.

On or about August 16, 2002, the Authority's Executive Director Juanita Moore received another confidential memorandum authored by Heather Brown. Ms. Brown reiterated her belief

that the formation of the American Jazz Museum, Inc., the City's termination of the agreement with the Authority, and the City's approval of an agreement with American Jazz Museum, Inc. "will protect the current revenues from the museum operations and the City subsidy from attachment by Gill Construction and Gill's creditors." On August 23, 2002, the Board of Directors of the Authority passed Board Resolution No. 02-001, transferring the assets of the Authority to the American Jazz Museum, Inc. Nothing of reasonably equivalent value was given to the Authority in consideration for this transfer of assets. Following this transfer, the Authority was insolvent and had no assets or income with which to pay Gill's June 2002 Judgment.

Following the denial of the Authority's post-trial motions in the litigation with plaintiff Gill in October of 2002, Ms. Brown communicated to Claude Page the need to get "the endowment funds put in the name of AJM [American Jazz Museum] asap."

It is undisputed that the 18th & Vine facilities were generating revenue for the Authority in 2002. This revenue was generated by museum admissions, gift shop sales, complex rentals, special events, investments, and other sources in addition to the subsidy received from the City. It is also undisputed that neither the Authority nor the City ever paid the June 2002 judgment in favor of Gill Construction despite the fact that all other debts of the Authority were paid.

## II. Standard

A motion for summary judgment should be granted if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Rafos v. Outboard Marine Corp., 1 F.3d 707, 708 (8th Cir. 1993) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). The moving party bears the burden of bringing forward sufficient evidence to

establish that there are no genuine issues of material fact for trial and that the movant is entitled to summary judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party opposing a properly supported motion for summary judgment may not rest upon the allegations contained in the pleadings, "but must set forth specific facts showing there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In reviewing a motion for summary judgment, this Court must scrutinize the evidence in the light most favorable to the non-moving party, according the non-moving party the benefit of every factual inference and resolving any doubts as to the facts or existence of any material fact against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 (1970).

## II. Discussion

Defendant Authority suggests that it lacked the ability to transfer assets because it is a "component unit" of the City. The Authority reasons that because plaintiff Gill obtained a judgment only against the Authority and the Authority lacked the ability to make a fraudulent transfer, the Authority cannot be held liable under the Missouri Uniform Fraudulent Transfers Act. Mo. Rev. Stat. §§ 428.005 to 428.059. On this basis, the Authority asks the Court to enter summary judgment in its favor.

A. "Component Unit"

First, the Authority's status as a "component unit" of the City is not relevant to the issues before the Court. This status as a "component unit" pertains to financial reporting. It has nothing to do with the legal status of the Authority or its liability for its acts and omissions.

Instead, based upon the undisputed facts before this Court, it appears that the Authority acted as a separate and distinct legal entity recognized as such by the State of Missouri. The

7

Authority had the latitude to engage in activities outside of its relationship with the City.

The Authority's argument also ignores the fact that the Board of Directors of the Authority passed Board Resolution No. 02-001 authorizing the transfer of assets from the Authority to the American Jazz Museum, Inc. The resolution is signed by the Chairman of the Board of Directors, contains a certification that it was "duly passed at a meeting of the Board of Directors," and that a "quorum was at all times present . . . ." This resolution was passed by the Board of Directors of the Authority independent of any relationship with the City.

There is no basis for finding that the Authority lacked the ability to transfer assets as suggested by the Authority.

B.    Fradulent Transfer

The Missouri Uniform Fraudulent Transfers Act ("the Act") governs transfers made to defraud creditors. Mo. Rev. Stat. §§ 428.005 to 428.059. The essential elements of a fraudulent transfer include the conveyance or assignment of goods or chattels with the intent to hinder, delay, or defraud creditors. Behr v. Bird Way, Inc., 923 S.W.2d 470, 473 (Mo. Ct. App. 1996). Plaintiff Gill alleges that the Authority acted independently to convey assets with the intent of preventing plaintiff Gill from collecting his June 2002 Judgment.

It is undisputed that, at a minimum, the Authority transferred the assets of the Authority to the American Jazz Museum, Inc. on August 23, 2002, when the Board of Directors of the Authority passed Board Resolution No. 02-001. Nothing of reasonably equivalent value was given to the Authority in consideration for this transfer of assets. Following this transfer, the Authority was insolvent and had no assets or income with which to pay Gill's June 2002 Judgment. Therefore, the Authority's claims that it was either incapable of making a transfer or

did not make a transfer are refuted by the record before the Court.

In addition, plaintiff Gill asserts that the Authority actively participated in the conveyance and redirection of its revenues to the American Jazz Museum, Inc. Under Missouri law, the redirection of revenue and assets with the intent to hinder, delay, or defraud collection of a judgment is a fraudulent transfer that gives rise to liability under the Act. Fischer v. Brancato, 147 S.W.3d 794, 798-99 (Mo. Ct. App. 2004); Fischer v. Brancato, 174 S.W.3d 82, 85, 87 (Mo. Ct. App. 2005).

When the City terminated the 2002 Management Agreement, the Authority had the contractual right to demand payment by the City for services rendered before the effective date of the termination. The Authority never asked the City to pay plaintiff Gill's June 2002 Judgment, despite the fact that all other outstanding debts of the Authority were paid.

The explanation for the Authority's actions in this case appears to be supported by plaintiff Gill's theory: that there was a conspiracy between the City and the Authority, and later the American Jazz Museum, to redirect revenues and transfer assets in an effort to avoid payment of Gill's June 2002 Judgment. The Court will allow a jury to resolve this issue, but there is absolutely no basis for granting the Authority's motion for summary judgment based upon the Authority's claim that it was incapable of making a fraudulent transfer.

C.  Civil Conspiracy

The Authority makes the conclusory argument that because plaintiff Gill's fraudulent transfer claim fails, plaintiff's conspiracy claim must fail as well. Alternatively, the Authority suggests that plaintiff Gill cannot prove that the Authority participated in any civil conspiracy to defraud. Plaintiff Gill responds that the Authority is jointly and severally liable as a conspirator

with the other named defendants.

"A civil conspiracy is an agreement or understanding between two or more persons to do an unlawful act, or to use unlawful means to do an act which is lawful." Trimble v. Prancna, 51 S.W.3d 481, 500 (Mo. Ct. App. 2001). "It is not a cause of action in and of itself, but rather, it acts to hold the conspirators jointly and severally liable for the underlying act." Id. at 501. A general knowledge of the essential nature of the plan will suffice to hold a participant liable. State Farm Mut. Auto Ins. Co. v. Weber, 767 S.W.3d 336, 338 (Mo. Ct. App. 1989).

The Authority claims that the City terminated its Management Agreement and, thereafter, it was the City that transferred its subsidy funding to the American Jazz Museum. The Authority argues that "at most" plaintiff "may be able to establish that the Authority had knowledge of such a transfer."

The Authority ignores significant undisputed facts identified by plaintiff Gill showing that the Authority was a co-conspirator. First, Heather Brown drafted a confidential memorandum directed to the Board of Directors of the Authority. While the Authority relies on the fact that none of the Board members have admitted receiving such a memo, Ms. Brown has testified that the Board discussed her memo and the options outlined therein that amount to efforts to avoid paying the judgment rendered in favor of plaintiff Gill in June of 2002. One of the options discussed in Ms. Brown's memo is the formation of a new entity to manage the museum. It is undisputed that after the date on which this memo was created, Authority Board members participated in meetings with the City where the formation of such an entity was discussed.

Ms. Brown, an attorney employed by the City, consulted with Authority Board members

as to when such a new entity should be set up and urged said Board members to act quickly. At least some of the Authority Board members actively participated in drafting the Articles of Incorporation for the new entity, the American Jazz Museum, Inc. While it was the City who transferred its subsidy to the newly formed American Jazz Museum, Inc., it was the Authority's Board that approved the transfer of all of the Authority's assets to the American Jazz Museum, Inc. Presumably, this transfer included the jazz museum and the revenues therefrom.

Therefore, it is disingenuous for the Authority to suggest that it merely had knowledge of the City's plan to transfer its subsidy to the newly formed American Jazz Museum, Inc. and was not a co-conspirator.

Furthermore, in a memo dated August 16, 2002, Ms. Brown admitted that the entire purpose of creating the new entity, moving the subsidy, and transferring the assets of the Authority to the American Jazz Museum, Inc. was to "protect the current revenues from the museum operations and the City subsidy from attachment by Gill Construction and Gill's creditors."

Missouri courts enforce claims for civil conspiracy to fraudulently convey when there is evidence that income and revenue streams have been redirected in order to avoid attachment. Fischer v. Brancato, 147 S.W.3d at 798-99; Fischer v. Brancato, 174 S.W.3d at 85, 87. Plaintiff Gill has adduced sufficient evidence from which a jury may find that the Authority was an active participant in the conspiracy to fraudulently convey assets, revenues, and income to avoid payment of the June 2002 Judgment. The Authority's motion for summary judgment is denied.

D.  Advice of Counsel Defense

The Authority claims that plaintiff Gill cannot show that it had any intent to defraud Gill

because the Authority's Board of Directors relied on the advice of their attorney, Heather Brown, who reassured the Authority that its actions "were neither fraudulent nor illegal." The Court finds it interesting that the Authority will not admit that any of its Board members actually received, read, or had any knowledge of Ms. Brown's July 8, 2002 memorandum, yet the Authority claims that Ms. Brown advised the Board on the legality of creating a new corporation for the express purpose of transferring the Authority's subsidy and assets to the new corporation for the stated purpose of avoiding the Gill judgment, the topic addressed specifically by Ms. Brown's July memo.

This fact aside, Gill need not show that the Authority intended to act in an illegal manner. Rather, Gill must show that the Authority conveyed goods, revenues or income generating operations, or participated in a conspiracy to do so, with the "intent to hinder, delay or defraud" Gill. *See* Fischer v. Brancato, 147 S.W.3d 794 (Mo. Ct. App. 2004). Gill has identified evidence from which a jury may reach such a conclusion.

Finally, the Authority has not identified any legal precedent that an advice of counsel defense may be used in a fraudulent transfer case.

## IV. Conclusion

For the reasons stated above, it is hereby

ORDERED that defendant The 18th & Vine Authority's Motion for Summary Judgment (Doc. #86) is denied.

/s/Scott O. Wright
SCOTT O. WRIGHT
Senior United States District Judge

Dated: September 21, 2006